Brent O. Hatch (5715)
  bhatch@hjdlaw.com
Phillip J. Russell (10445)
  prussell@hjdlaw.com
HATCH, JAMES, & DODGE, P.C.
10 West Broadway, Suite 400
Salt Lake City, Utah 84101
Telephone: (801) 363-6363
Facsimile: (801) 363-6666

Mark A. Klapow (*pro hac vice* forthcoming)
  mklapow@crowell.com
Michael J. Songer (*pro hac vice* forthcoming)
  msonger@crowell.com
CROWELL & MORING LLP
1001 Pennsylvania Avenue NW
Washington, DC 20004
Telephone: (202) 624-2500
Facsimile: (202) 628-5116

*Attorneys for Plaintiffs Derive Power, LLC
and Derive Systems, Inc.*

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| DERIVE POWER, LLC; and DERIVE SYSTEMS, INC.;<br><br>                Plaintiffs,<br><br>v.<br><br>EZ LYNK, SEZC; H&S PERFORMANCE, LLC; THOMAS WOOD; LANCE HUNTER; TECHIT, LLC; GDP TUNING, LLC; and POWER PERFORMANCE ENTERPRISES, INC.;<br><br>                Defendants. | **COMPLAINT**<br><br><br>Case No. 2:16-cv-01066-DS<br><br>Judge David Sam<br><br>**JURY DEMANDED** |

Plaintiffs Derive Power, LLC and Derive Systems, Inc. (together, "Derive"), through counsel, allege as follows:

## NATURE OF DISPUTE

1.      This case arises from Defendants' theft, misappropriation, and infringement of Derive's intellectual property related to its "Bully Dog" brand of products in violation of federal and state law.

2.      Derive's Bully Dog brand is a leading brand in automotive technology products. Through its Bully Dog brand, Derive makes devices commonly called "performance programmers" that can be plugged into a vehicle's computer system to allow the customization and modification of certain parameters of the vehicle and its performance.  Derive sells its products throughout the United States and internationally.

3.      Former employees of Derive or its corporate predecessors, including Defendant Wood, founded a new company, Defendant EZ LYNK, which they incorporated in the Cayman Islands.  EZ LYNK produces and markets products that compete with Derive's performance programmers.  Wood's involvement in EZ LYNK, either by himself and/or through Defendant TechIT, LLC, is in violation of his restrictive covenants he made to Derive.

4.      EZ LYNK and its principals have also taken Derive software code, removed the markings that indicate that the code belongs to Derive, and reissued the software inside EZ LYNK devices, thus infringing the copyrights that Derive holds on that software.  EZ LYNK and its principals also have taken other Derive software code that Derive maintains as a trade secret and EZ LYNK has used those misappropriated trade secrets to support the EZ LYNK devices.

Defendants GDP Tuning, LLC and Power Performance Enterprises, Inc. are similarly complicit in their resale of products that infringe Derive's copyrights.

5.      Another entity, Defendant H&S Performance, LLC ("H&S"), has also infringed Derive's copyrights and trade dress and misappropriated Derive's trade secrets. Derive and H&S used to be in a business relationship, but that relationship ended in 2014. After that termination, H&S continued to make and sell performance programmers that incorporated Derive's copyrighted software and that appeared substantially similar to Derive's performance programmers. On information and belief, H&S also supported these devices with Derive's trade secrets. All of these activities have, since 2014, occurred without a license from Derive.

6.      Defendants improperly seek to take advantage of Bully Dog's good will, financial investment, and intellectual property for their own benefit. They are infringing or misappropriating Derive's intellectual property, including trade secrets, copyrights, and trade dress. They are also destroying important business goodwill and relationships by using Derive property for illegal emissions-defeating devices. Wood and Hunter have taken the additional step of violating their restrictive covenants and engaging in unfair competition rather than abiding by their obligations to Derive. All of Defendants actions have also caused significant harm to Derive by virtue of disrupting Derive's workplace and employees.

7.      Accordingly, this action seeks temporary and permanent injunctive relief to prevent Defendants from using Bully Dog's intellectual property and to enforce Defendant Wood's restrictive covenants, full compensation for Derive's losses, exemplary and punitive damages, and attorney fees.

## PARTIES

8.      Plaintiff Derive Power, LLC ("Derive Power") is a limited liability company organized under the laws of Delaware and has a primary place of business in Sanford, Florida.

9.      Plaintiff Derive Systems, Inc. ("Derive Systems" and, collectively with Derive Power, "Derive") is incorporated in Delaware and has a primary place of business in Sanford, Florida.

10.      Defendant EZ LYNK SEZC ("EZ LYNK") is incorporated in the Cayman Islands and has a primary place of business at 125 Owen Roberts Dr., George Town, Cayman Islands KY1-1003. EZ LYNK sells products throughout the United States and internationally, including within the State of Utah.

11.      Defendant H&S Performance, LLC ("H&S") is a limited liability company organized under the laws of Utah and has a primary place of business at 4160 South River Road, St. George, Utah 84790. H&S sells products throughout the United States and internationally, including within the State of Utah.

12.      Defendant Thomas Wood is an individual who resides in or near St. George, Utah and conducts business within the State of Utah in connection with H&S and other Defendants.

13.      Defendant Lance Hunter is an individual who resides in or near Idaho Falls, Idaho, who conducts business within the State of Utah in connection with EZ LYNK, TechIT, and Wood, and who has regular contacts with the State of Utah.

14.      Defendant TechIT, LLC ("TechIT") is a limited liability company organized under the laws of Utah and has a primary place of business at 1174 S. Dixie Dr., St. George, UT. TechIT's sole function is to support EZ LYNK performance programmers.

15.     Defendant GDP Tuning, LLC ("GDP") is incorporated in Idaho and has its principal place of business in Rexburg, Idaho. On information and belief, GDP operates a warehouse facility in Washington, Utah. GDP is one of two master distributors for EZ LYNK products and sells products throughout the United States, including within the State of Utah.

16.     Defendant Power Performance Enterprises, Inc. ("PPEI") is incorporated, and operates, in Louisiana. PPEI is a master distributor for EZ LYNK products and sells products throughout the United States, including within the State of Utah.

## RELATED INDIVIDUALS AND ENTITIES

17.     On information and belief, Payton Hugie is an individual who resides in or near St. George, Utah, and conducts business within the State of Utah in connection with H&S, EZ LYNK, and Wood.

18.     On information and belief, Daniel Shirts is an individual who resides in or near St. George, Utah and conducts business within the State of Utah in connection with H&S, EZ LYNK, and Wood.

19.     On information and belief, Bentley Hugie is an individual who resides in or near St. George, Utah, and conducts business within the State of Utah in connection with H&S, EZ LYNK, and Wood.

20.     On information and belief, Casey Shirts is an individual who resides in or near St. George, Utah, and conducts business within the State of Utah in connection with H&S, EZ LYNK, and Wood.

21.     On information and belief, Bradley Gintz is an individual who resides in or near Lake Charles, Louisiana, and conducts business within the State of Utah in connection with EZ

LYNK, and Wood. Mr. Gintz is responsible for many of EZ LYNK's operations, including establishing EZ LYNK as a corporation. On information and belief, Mr. Gintz has a role in EZ LYNK product development and manufacture.

22.     On information and belief, Jeremy Pierce is an individual who resides in or near St. George, Utah, and conducts business within the State of Utah in connection with his company Defendant GDP's operations in Washington, Utah, and in connection with H&S, EZ LYNK, and Wood. Mr. Jeremy Pierce is a former H&S employee and a current employee of Defendant GDP.

23.     On information and belief, Barry Pierce is an individual who resides in or near Rexburg, Idaho, and conducts business within the State of Utah in connection with his company Defendant GDP, as well as H&S, EZ LYNK, and Wood.

24.     On information and belief, Kory Willis is an individual who resides in or near Lake Charles, Louisiana, and conducts business within the State of Utah in connection with his company Defendant PPEI, as well as Defendants H&S, EZ LYNK, and Wood. On information and belief, Mr. Willis has an interest in EZ LYNK, either directly or through other corporate entities located in the Cayman Islands.

## JURISDICTION AND VENUE

25.     This Court has federal subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs have asserted federal claims under the Copyright Act (17 U.S.C. § 101, *et seq.*), the Defend Trade Secrets Act (18 U.S.C. § 1831, *et seq.*), and the Lanham Act (15 U.S.C. § 1051, *et seq.*). Pursuant to 28 U.S.C. § 1367, the Court also has supplemental or pendant

jurisdiction over Plaintiffs' remaining claims insofar as those claims form part of the same case or controversy as the federal question claims under Article III of the United States Constitution.

26.     This Court has personal jurisdiction over all of the Defendants under principles of specific and general jurisdiction as each has sufficient contacts with Utah.

27.     Venue in the District of Utah is appropriate under 28 U.S.C. § 1391, as a substantial part of the actions giving rise to the claims herein occurred in this District.

**Background Facts**

28.     Plaintiffs are the owners of the "Bully Dog" brand. Between its founding in 1998 and 2014, the Bully Dog brand was owned by Bully Dog Technologies ("BDT"), an independent company. BDT has been a major developer and supplier of hardware and software solutions aimed at improving the performance of automotive vehicles. In 2014, Derive acquired substantially all of the assets of BDT, including the Bully Dog brand. Derive thereafter integrated the Bully Dog brand into the Derive business, which included a new corporate structure and new management.

29.     Derive continues to develop and market technology solutions under the Bully Dog brand that offer users ways to maximize vehicle power, improve fuel efficiency, and enable vehicle customization. These solutions include performance programmers that can provide numerous performance benefits to vehicles, as well as the ability to install certain aftermarket products that allow further vehicle customization for particular applications and uses. Derive has registered its on-device software code for copyright protection under U.S. laws. Derive also maintains its support software for those devices as trade secrets.

I.      **Relationships Among the Parties.**

    A.      <u>Defendant H&S Licenses Software and Hardware from BDT</u>

    30.    H&S is a company involved in technology solutions in the automotive space, including performance programmers.  In 2008, BDT and H&S entered into a software license agreement, later amended and renamed a Software License and Hardware Purchase Agreement (the "H&S License Agreement"), attached hereto as Exhibit 1.  Under the H&S License Agreement, BDT manufactured and sold to H&S "private label" hardware, *i.e.*, the casings, wiring, circuit boards, and display screens used in H&S-branded performance programmer units sold by H&S.

    31.    The H&S License Agreement also granted H&S a license to BDT's performance programmer-related firmware.  The H&S License Agreement further granted H&S a license to BDT's trade secrets in the form of support software for the performance programmers, and obligated H&S to take reasonable measures to maintain the confidentiality of these trade secrets. All licenses granted to H&S under the H&S License Agreement were strictly limited to the use of the licensed software in relation to the "private label" hardware supplied to H&S by BDT under the H&S License Agreement.  H&S was not authorized to use, upload, or modify the software for any other device.  H&S paid BDT a licensing fee for the firmware and support software and a per-device fee for the hardware under the H&S License Agreement.

    B.      <u>Defendant Tom Wood's Employment with BDT</u>

    32.    BDT engineer Tom Wood was integral in BDT's relationship with H&S. In this role, Wood had broad access to BDT's confidential and proprietary information, including the source code for its firmware and trade secret support software.  In 2012, Wood signed a new

confidentiality agreement and other restrictive covenants with BDT. In that agreement, Wood committed, for the period of his employment and thereafter, to protect BDT's hardware and software intellectual property, to respect the confidentiality of BDT's business information, not to compete or solicit BDT customers, and not to solicit BDT employees. That agreement is attached hereto as Exhibit 2.

33.    During much of his employment with BDT, Wood was working almost exclusively on servicing H&S. He spent large portions of his time at H&S facilities in St. George, Utah.

C.    Derive Terminates the "Bully Dog" Relationship with H&S

34.    Around the same time that Derive was conducting due diligence for its transaction with BDT, BDT informed Derive that H&S was involved in marketing "defeat devices" and was the target of investigations by both the U.S. Environmental Protection Agency ("EPA") and California Air Resources Board ("CARB"). At that time, BDT and its prior owners told Derive that BDT had become concerned about the relationship between BDT and H&S. BDT and its prior owners also told Derive that BDT had thus ceased all private label hardware sales to H&S and terminated H&S's license rights under the H&S License Agreement.

35.    On February 28, 2014, Derive acquired substantially all of the assets of BDT. After the transaction, Derive learned that the former BDT owners did not disclose, and appear to have taken measures to minimize and conceal, the full scope or nature of the continuing relationship between BDT and H&S, and Wood's role and conduct in that relationship. Accordingly, Derive did not begin to learn until after the transaction that the relationship had

continued despite BDT's former owners' representations, and did not begin to learn the full extent of the relationship or the details described herein.

36.     Thus, shortly after the February 28, 2014 transaction, and based on information that was not disclosed by the former owners of BDT in connection with the transaction, Derive terminated the relationship with H&S altogether. Thereafter, H&S was no longer authorized to use, upload, or market any Derive or BDT software or hardware.

37.     After Derive terminated the relationship with H&S, Wood continued to work on other tasks associated with Derive engineering. On information and belief, Wood also continued to support H&S and its defeat devices without Derive's knowledge.

D.     Derive Acquires the "Bully Dog" Brand and Wood Resigns

38.     On July 15, 2014, shortly after Derive's acquisition of the "Bully Dog" brand,, Wood resigned. On information and belief, Wood moved to St. George, Utah, living initially in housing owned by H&S. Wood then began working full time for his company, TechIT, which he had incorporated on March 7, 2014, more than three months prior to his resignation from BDT / Derive. On information and belief, Wood's work with TechIT since then has included the servicing of performance programmer products that he supported during his time at BDT and Derive.

E.     Derive Becomes Concerned about Defendant Wood's Activities

39.     In late 2014, Derive management heard industry rumors that Wood was working to establish a new competitive business through the improper use of Derive's intellectual property. Derive was not aware of this information prior to the transaction. Derive then sent Wood a "cease and desist" letter to stop his competitive activities and to seek assurances that he

had not misappropriated Derive's information.  Wood responded through his counsel that he had

no role in the development and marketing of performance programmers.  He further stated that

his only business activities were performed under the name of a new Utah company, TechIT,

LLC.  That letter is attached hereto as Exhibit 3.  The parties eventually entered into a "standstill

agreement," in which Wood represented, in writing and under oath, that he had not transferred or

used Derive information and devices.  Wood also represented that he had returned all Derive

information and devices, and reaffirmed his obligations to protect Derive's confidential

information.  *See* Exhibit 3.

       F.      <u>Wood Forms EZ LYNK to Develop and Market Competitive, and Illegal, Devices</u>

      40.      In late 2015, Derive started hearing industry reports about a new defeat device

marketed under the name EZ LYNK. This report was confirmed in June 2016, when EZ LYNK

launched its products.

      41.      On information and belief, Wood and various individuals associated with H&S

formed EZ LYNK and its affiliated entities on or about July 14, 2014—before Wood had

resigned from Derive—incorporating EZ LYNK in the Cayman Islands. On information and

belief, and from all appearances, EZ LYNK was created to continue the activities of H&S in the

development and marketing of illegal defeat devices.

      42.      On information and belief, the other EZ LYNK founders that are closely tied to

H&S include (a) Payton Hugie, the brother of H&S co-founder Bentley Hugie, (b) Daniel Shirts,

the brother of H&S co-founder Casey Shirts, and (c) Brad Gintz, who manages EZ LYNK's

operations in the Cayman Islands. Moreover, on information and belief, EZ LYNK's executives

include (a) Jeremy Pierce, the owner of Defendant GDP, who has moved individually to St.

George, Utah, the home of H&S; and (b) Kory Willis, the owner of PPEI. On information and belief, GDP and PPEI are the principal distributors of EZ LYNK products, and have close ties to H&S.

43.     EZ LYNK's technology centers on a performance programmer device named Auto Agent. That device allows the upload of programs called "tunes" into a vehicle's electronic systems. These tunes allow the modification of how a vehicle operates to improve vehicle performance, to enable the installation of other aftermarket auto parts, or to perform other enhancements. While there are many legal and legitimate uses of this technology, such as those Derive develops and promotes, these tunes can also be used as to facilitate the overriding, removing, or otherwise tampering with control systems in violation of the law. For example, "tunes" can allow a user to bypass legally mandated emissions control systems. Some of the tunes that can be loaded into a car via EZ LYNK's Auto Agent product allow for a "no emissions" feature, a fact that is widely known within the relevant community.

44.     On information and belief, EZ LYNK is well aware of the "no emissions" use, of its devices and in fact acts in concert with third parties, including GDP and PPEI, to develop and market such "no emissions" features.

## II.     Derive's Intellectual Property

45.     Derive's intellectual property includes, but is not limited to, (a) performance programmer firmware source code, which is protected by U.S. registered copyrights, (b) performance programmer software support code, which Derive maintains as a trade secret, and (c) Derive's trade dress for its performance programmers.

46.     Derive's copyrighted firmware generally operates the hardware of Derive's performance programmer devices and allows the devices to upload and download other software to a vehicle engine control unit (or "ECU"). This firmware is loaded directly on the devices for use by the devices.

47.     Derive's trade secret support software is not provided to its customers, but is maintained by Derive for use on a separate device, such as a PC, to support the performance programmer devices and its firmware. This support software includes software to create calibration, or the "tune" files. As indicated above, "tunes" are the specific pieces of code that are uploaded onto a vehicle's ECU by the performance programmer devices to actually make modifications to the vehicle. While these "tune" files are loaded on the device, the software used to create them is not, and the secrecy of the support software is valuable to Derive.

48.     Derive promotes a culture of respect for company confidential information and protects its intellectual property, including its software code, trade secrets, confidential and proprietary information, in a number of ways. For instance, Derive requires that all employees, contractors, vendors, and partners sign agreements that contain strict confidentiality provisions. Employees are told about Derive's confidentiality policies and expectations when they begin employment, and are again reminded of their confidentiality obligations through periodic training and through off-boarding procedures when their employment ends.

49.     Derive's facilities are closed to the public and require either key fob or fingerprint access to the facilities. Even for employees with key fobs or access by fingerprint, Derive uses schedules to limit employee access to facilities at certain times.

50.     Derive's computer systems and servers are password protected. Highly confidential information on computer systems is limited only to employees who have a need to access such information. Derive retains the right to remove company information from personal devices, such as smart phones, at any time.

**III.     Defendants' Theft of Derive Intellectual Property**

     A.     EZ LYNK Has Copied and Uses Derive's Software Code

51.     In June 2016, Derive purchased an EZ LYNK performance programmer. Derive performed an analysis on the unit to determine whether it operated in any way using Derive's proprietary information, including computer code.

52.     Derive's analysis revealed that elements of the software code that operates the EZ LYNK device is Derive's code, down to a complete duplication of Derive's software code. That duplication is obvious upon inspection, which shows identical code, organization, and logic. A comparison of a portion of the Derive and EZ LYNK code is attached hereto as Exhibit 4. The code in devices sold by EZ LYNK also produces the exact same messages that the Derive code produces. *See* Exhibit 5.

53.     The only change EZ LYNK made to the Derive's software code was to delete the comment marker in the code that stated, "Copyright Bullydog 2010." These comment markers, which are routinely inserted into computer software programs, are akin to the footer in certain published documents that provide the copyright symbol and the name of the publisher/copyright holder.

54.     In addition, a comparison of Derive's copyrighted code to the code used by EZ LYNK shows that EZ LYNK has copied a specific feature present in Derive's code. This feature

is known as "on the fly" shifting, which allows a driver to shift between power modes (or different tunes) while driving the vehicle. A character-by-character analysis of the software code shows that EZ LYNK copied the Derive software that had been licensed to H&S, under the H&S License Agreement, exclusively for use in private-label devices sold to H&S. That license expired, and Derive ceased selling such devices to H&S nearly three years ago.

55.     On information and belief, EZ LYNK and Wood have additionally misappropriated Derive's trade secrets which were unlawfully taken by Wood after his resignation and used in his development of the EZ LYNK devices. The process to create the Derive trade secret support software was extremely complicated and required an enormous number of man-hours, failures, and workarounds to achieve. Derive also designed its trade secret support software to work in concert with the copyrighted firmware on the Derive devices to support those devices.

56.     Wood had access to the support software by virtue of his employment at BDT and Derive. EZ LYNK and Wood have also unlawfully incorporated Derive copyrighted firmware into EZ LYNK devices. Therefore, on information and belief, EZ LYNK and Wood have also continued to use the trade secret support software that is designed to work in concert with the copyrighted firmware. On information and belief, EZ LYNK has not independently developed any viable support software on its own, or by using employees who had never been aware of the Derive trade secret support software, which obviously excludes Wood.

B.     H&S's Improper Use of Derive Hardware and Software.

57.     Contemporaneously with the analysis of EZ LYNK's software, Derive discovered that H&S has recently been marketing and selling performance programmers built with Derive's

15

hardware and operating on software previously licensed to H&S under the H&S License Agreement. These sales activities occurred after the termination of the H&S Agreement. In addition, the performance programmers marketed and sold by H&S after the license termination included emissions-defeating capabilities.

58.     Derive obtained samples of H&S devices marketed on various Internet sites and examined them in detail. The hardware in the H&S devices in question contain markings and codes establishing that they had been manufactured by Derive in 2016, long after the termination of the H&S License Agreement.

59.     The examined devices had actual Derive parts (LCD screens and printed circuit boards) and embedded software, even though these components were not sold by Derive to H&S. Thus, on information and belief, H&S purchased Derive devices, gutted them, extracted the circuit boards and LCD screens, and then replaced the firmware with the firmware that H&S had previously licensed from BDT under the now-defunct H&S License Agreement in violation of that agreement. On information and belief, H&S then uploaded emissions-defeating software onto the devices and re-packaged the devices in new, low-cost plastic shells. A basic examination shows that those shells are manufactured to look exactly like the original BDT devices, and the current Derive devices, with the same display shape and the same buttons on each side of the device. From those buttons to the LCD screen to the shape of the units to the operating software, these H&S devices were built to be difficult to distinguish from the market-leading Derive products sold under the Bully Dog brand. The duplication of Bully Dog's format and design is shown in Exhibit 6.

60.     On information and belief, H&S has additionally misappropriated Derive's trade secrets which were unlawfully acquired and used by H&S after the termination of the H&S License Agreement to support H&S devices.  The process to create the Derive trade secret support software was extremely complicated and required an enormous number of man-hours, failures, and workarounds to achieve.  Derive also designed its trade secret support software to work in concert with the copyrighted firmware on the Derive devices to support those devices.

61.     H&S had access to the support software by virtue of the H&S License Agreement and through its dealings with Wood. H&S has continued the use of Derive copyrighted firmware in H&S devices.  Therefore, on information and belief, H&S has also continued to use the trade secret support software that is designed to work in concert with the copyrighted firmware.  On information and belief, H&S has not independently developed any such viable support software on its own or by using employees who had never been aware of the Derive trade secret support software.

C.      Resellers of the EZ LYNK Devices

62.     PPEI and GDP are the two primary dealers that offer custom calibrations for EZ LYNK devices.  PPEI and GDP have also jointly marketed the EZ LYNK hardware, and their associated calibrations, to PPEI's and GDP's followers via podcasts, videos, and through social media.

63.     PPEI sells EZ LYNK devices and custom calibrations directly off their website, as well as through a network of dealers.  PPEI offers for sale, and on information and belief has sold, EZ LYNK devices throughout the United States, including in Utah.

64.     GDP is a distributor of EZ LYNK devices to its network of dealers and also offers GDP custom calibrations for the EZ LYNK devices through that network of dealers. GDP offers for sale, and on information and belief has sold, EZ LYNK devices throughout the United States, including in Utah.

65.     On information and belief, the custom calibrations sold by PPEI and GDP use the EZ LYNK product to defeat vehicle emissions controls in violation of EPA regulations. On information and belief, EZ LYNK is aware of and encourages this improper conduct by its distributors PPEI and GDP. For example, while EZ LYNK *markets* their device without "tunes," it intentionally does not *sell* such devices to the consumer. Instead, EZ LYNK distributes the devices to defendants PPEI and GDP. In turn, PPEI and GDP load "tunes" onto the EZ LYNK device that allows a user to disable emissions control systems. On information and belief, EZ LYNK develops, markets, and sells its EZ LYNK devices with full knowledge and of and complicity in PPEI's and GDP's actions. Also on information and belief, PPEI and GDP have obtained Derive's trade secret support software from Wood, EZ LYNK, and/or H&S. On information and belief, PPEI and GDP have used that support software to learn how Derive's software and firmware operates. This knowledge was used in an improper manner in turn by PPEI and GDP to create the "tunes" used to disable emission control systems.

## IV.     EZ LYNK and Wood Solicit Derive Employees

66.     Wood had been preparing to compete against Derive for quite some time, even before his resignation. To further that competition, Wood made significant efforts since his resignation in 2014 to recruit Derive employees to work with him, in violation of his non-solicitation-of-employees obligation.

67.     On information and belief, Wood's first recruit was Lance Hunter. Wood convinced Hunter to resign his Derive employment and to join Wood in his competitive ventures. Hunter gave notice to Derive and claimed he was leaving the company to start a new chapter of his life as a real estate agent. On information and belief, Hunter's real estate job was a cover story for his plan to join Wood, in violation of his contractual obligations to Derive.

68.     In addition, Wood recently reached out to Derive employees to have them join EZ LYNK. Wood explained to these employees that they could make the move, despite non-competition covenants, because they would become employees of Wood's own customer support company, TechIT, without disclosing that they would actually be working for EZ LYNK. These employees declined this solicitation and reported it to Derive.

## COUNT I – COPYRIGHT INFRINGEMENT
### (17 U.S.C. § 101, *et seq.*)
### (AGAINST DEFENDANTS EZ LYNK, H&S, PPEI, GDP, WOOD, and TECHIT)

69.     Derive re-alleges and incorporates by reference the preceding paragraphs as though fully set forth herein.

70.     Derive owns copyrights entitled "Ford 6.7 Liter Download Firmware v1007," registered on September 21, 2016, and "Ford 6.7 Liter Monitor/Datalog/Power Level Adjusting Firmware v1007," registered on September 21, 2016, for its firmware source code used in its performance programmer devices.

71.     All Defendants except Hunter have deliberately and intentionally, without Derive's authorization, copied and distributed Derive's copyrighted firmware source code.

72.     All Defendants except Hunter have copied and distributed the copyrighted firmware source code in a manner that clearly infringes on Derive's copyrights and, unless these Defendants are enjoined, they will continue to do so.

73.     Defendants GDP and PPEI also have deliberately and intentionally, without Derive's authorization, sold and otherwise distributed products that incorporate Derive's copyrighted firmware source code.

74.     Defendants H&S, EZ LYNK, Wood, and TechIT are also liable for vicarious and contributory copyright infringement of Derive's copyrighted firmware source code, as they have induced, caused, or materially contributed to the infringing conduct of others, with knowledge of the infringing activity. Defendants H&S, EZ LYNK, Wood, and TechIT have the right and ability to control the infringing activity, and have a direct financial interest in that conduct.

75.     The infringing conduct includes, for example, the activities of Defendants GDP and PPEI with respect to EZ LYNK performance programmers. EZ LYNK sells or otherwise forwards its performance programmer devices to its distributors, Defendants GDP and PPEI. GDP and PPEI sell products incorporating the copyrighted firmware source code in a manner that clearly infringes on Derive's copyrights and, unless Defendants EZ LYNK, GDP, and PPEI are enjoined, they will continue to do so.

76.     As a direct result of the infringement of Derive's copyrights, Derive has sustained, and will continue to sustain, substantial injury, loss, and damages in an amount to be proven at trial.

77.     Derive is entitled to a permanent injunction restraining Defendants and all persons acting in concert with them from engaging in further acts of copyright infringement.

**COUNT II – MISAPPROPRIATION OF TRADE SECRETS**
**(18 U.S.C. § 1831, *et seq.*)**
**(AGAINST DEFENDANTS EZ LYNK, H&S, WOOD, TECHIT, GDP, AND PPEI)**

78.     Derive re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

79.     Derive operates its business and sells its products in interstate and foreign commerce, transacting and doing business with customers, vendors and others throughout the United States and internationally.

80.     Derive conceives, designs, and develops trade secrets, as that term is defined under the Defend Trade Secrets Act, 18 U.S.C. § 1836(b), as amended (the "DTSA").

81.     Among other information, Derive's trade secrets encompass confidential and proprietary intellectual property, including but not limited to the software support code for the current Derive performance programmer devices and the past BDT performance programmer devices, as well as other forms of customer goodwill associated with its customers, prospective customers and vendor relationships.

82.     Derive obtains actual and potential economic value from its trade secrets not being generally known or readily ascertainable through proper means by another person or entity who could obtain economic value from the disclosure or use of the information.

83.     Derive obtains economic value from its trade secrets though devoting substantial resources, time and investment to creating, developing and using such information.

84.     As is detailed in the foregoing allegations, Derive has taken reasonable steps and precautions to safeguard its trade secrets and to limit and restrict others outside of Derive from knowing, readily ascertaining or using its trade secrets.

85.     All of the Defendants except H&S and Hunter have willfully and maliciously engaged in various acts of misappropriation regarding Derive's trade secrets, including but not limited to the improper acquisition, disclosure, and use of the Derive software support code for the purpose of producing and delivering EZ LYNK performance programmers.

86.     Defendant H&S has willfully and maliciously engaged in various acts of misappropriation regarding Derive's trade secrets, including but not limited to the improper acquisition, disclosure, and use of the Derive software support code for the purpose of producing and delivering H&S performance programmers.

87.     As a result of Defendants' improper misappropriation, disclosure and use of Derive's trade secrets, Defendants have violated the DTSA.

88.     As a direct and proximate result of Defendants' violations of the DTSA, Derive is entitled to full compensatory and consequential damages, as well as full attorneys' fees, costs and expenses.

89.     Because Defendants' DTSA violations have been willful and malicious, Derive is entitled to exemplary damages of twice the amount of damages for any actual loss and any unjust enrichment.

90.     Defendants' DTSA violations have caused and will continue to cause Derive irreparable harm that is not adequately remedied at law and that requires preliminary and permanent injunctive relief.

## COUNT III – MISAPPROPRIATION OF TRADE SECRETS
### (Utah Code Ann. § 13-24-1, *et seq.*)
### (AGAINST DEFENDANTS EZ LYNK, H&S, WOOD, TECHIT, GDP, AND PPEI)

91.     Derive re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

92.     Derive operates its business and sells its products in interstate and foreign commerce, transacting and doing business with customers, vendors and others throughout the United States and internationally.

93.     Derive conceives, designs, develops and transacts business relating to trade secrets as that term is defined under the Utah Uniform Trade Secrets Act, Utah Code Ann. § 13-24-2(4), as amended (the "UTSA").

94.     Among other information, Derive's trade secrets encompass Derive's confidential and proprietary intellectual property, including but not limited to the software support code for the current Derive performance programmer devices and the past BDT performance programmer devices, as well as other forms of customer goodwill associated with its customers, prospective customers and vendor relationships.

95.     Derive has and continues to derive actual and potential economic value from its trade secrets not being generally known or readily ascertainable through proper means by another person or entity who could obtain economic value from the disclosure or use of the information.

96.     Derive has and continues to derive economic value from its trade secrets though hard work and dedication in which it has devoted substantial resources, time and investment to creating, developing and using such information.

23

97.     As is detailed in the foregoing allegations, Derive has taken reasonable steps and precautions to safeguard, limit and restrict others outside of Derive from knowing, readily ascertaining or using its trade secrets.

98.     All of the Defendants except H&S and Hunter have willfully and maliciously engaged in various acts of misappropriation regarding Derive's trade secrets, including but not limited to the improper acquisition, disclosure and use of the Derive support code for the purpose of producing and delivering EZ LYNK performance programmers.

99.     Defendant H&S has willfully and maliciously engaged in various acts of misappropriation regarding Derive's trade secrets, including but not limited to the improper acquisition, disclosure and use of the Derive support code for the purpose of producing and delivering H&S performance programmers.

100.     As a result of Defendants' improper misappropriation, disclosure and use of Derive's trade secrets, Defendants have violated the UTSA.

101.     As a direct and proximate result of Defendants' violations of the UTSA, Derive is entitled to full compensatory and consequential damages, as well as full attorneys' fees, costs and expenses.

102.     Because Defendants' UTSA violations have been willful and malicious, Derive is entitled to exemplary damages of more than twice the amount of damages for any actual loss and any unjust enrichment.

103.     Defendants' UTSA violations have caused and will continue to cause Derive irreparable harm that is not adequately remedied at law and that requires preliminary and permanent injunctive relief.

**COUNT IV – UNFAIR COMPETITION AS TO BULLY DOG TRADE DRESS**
**(15 U.S.C. § 1125(a))**
**(AGAINST DEFENDANT H&S)**

104.    Derive re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

105.    Plaintiffs' "Bully Dog" trade dress has acquired secondary meaning. Consumers generally perceive the appearance of a Derive "Bully Dog" branded performance programmer as identifying that the product is in fact a Derive "Bully Dog" branded device.

106.    Defendant H&S's unauthorized use, in interstate commerce, of knockoffs, duplicates, or confusingly similar imitations of Derive's trade dress has caused and is likely to cause confusion, deception, and mistake by creating the false and misleading impression that Defendants' goods are manufactured or distributed by Derive, or are affiliated, connected, or associated with Derive, or have the sponsorship, endorsement, or approval of Derive.

107.    Defendant H&S's activities have caused and, unless enjoined by the Court, will continue to cause a likelihood of confusion and deception of members of the public and substantial injury to Derive's goodwill and reputation for which Derive has no adequate remedy at law.

108.    Defendant H&S's actions demonstrate an intentional, willful, and malicious intent to trade on the goodwill established by and associated with Derive's trade dress to the substantial and irreparable injury of Derive.

109.    Defendant H&S's conduct has caused and is likely to continue causing substantial and irreparable injury to the public and Derive, and Derive is entitled to injunctive relief and to

recover Defendants' profits, actual damages, enhance damages, costs, and reasonable attorneys' fees, pursuant to 15 U.S.C. §§ 1116, 1117, and 1125(a).

## COUNT V – FRAUD
### (AGAINST DEFENDANT WOOD)

110.    Derive re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

111.    Defendant Wood, in the standstill agreement, represented in writing and under oath that:

        a.      He had not transferred or used any Derive information, including confidential or proprietary information, outside of Derive;

        b.      He had returned all Derive information, including confidential or proprietary information, and devices;

        c.      He would protect the confidentiality of Derive information, including confidential or proprietary information that he knew or was aware of based on his work at BDT and Derive.

112.    Defendant Wood's representations concerned materials facts. The confidential nature of the information and Derive's interests in maintaining the confidentiality of that information is integral to its business.

113.    Defendant Wood's representations were false. Starting through Wood's work at TechIT for H&S, and continuing through Wood's work at EZ LYNK, Defendant Wood transferred and used Derive information, including confidential or proprietary information, outside of Derive.

114.    Defendant Wood knew his representations were false when made, or were made recklessly, due to his conduct.

115.    Defendant Wood made said representations, in the standstill agreement, for the purpose of inducing Derive to enter the said standstill agreement, and therefore causing Derive to not take further action, including pursuing legal action, to protect their property, good will, and reputation.

116.    Relying on Defendant Wood's fraudulent representations, Derive executed the standstill agreement and ceased any further action, including pursuing legal action, to protect their property, good will, and reputation.

117.    Derive acted reasonably and in good faith based on and in ignorance of the falsity of Defendant Wood's representations.

118.    As a result of Defendant Wood's fraudulent representations in the standstill agreement, Derive has been injured and incurred substantial damages.

## COUNT VI – BREACH OF CONTRACT
## (AGAINST DEFENDANT H&S)

119.    Derive re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

120.    Defendant H&S entered into the valid H&S License Agreement, permitting H&S to use BDT software and hardware for certain limited purposes. In particular, H&S's use was strictly limited to the upload of BDT software onto BDT devices and the use of BDT support software to support BDT devices; H&S was not authorized to use it, upload it, or modify it for any other device.

121.    Defendant H&S has materially breached the H&S License Agreement by using BDT software received pursuant to the H&S License Agreement in H&S devices, rather than in BDT devices, and by using BDT support software received pursuant to the H&S License Agreement to support H&S devices, rather to support BDT devices.

122.    As a result of H&S's breaches of the H&S License Agreement, Derive has been injured irreparably.

123.    Derive is entitled to full compensatory and consequential damages, as well as full injunctive relief.

**COUNT VII – BREACH OF CONTRACT**
**(AGAINST DEFENDANT WOOD)**

124.    Derive re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

125.    Defendant Wood signed valid agreements under Idaho law during his employment with BDT. Those agreements impose valid and enforceable obligations on Wood, including obligations during their employment and for periods of time thereafter, to protect BDT's hardware and software trade secrets, to respect the confidentiality of BDT's business information, not to prepare to compete, compete or solicit BDT customers, and not to solicit BDT employees.

126.    Defendant Wood has materially breached these agreements by among other things:  (1) preparing to compete with Derive during his employment and during the restricted period thereafter; (2) competing with Derive by producing and selling rival products; (3) soliciting Derive employees to terminate their employment relationship with Derive; and (4) misappropriating and misusing Derive's confidential proprietary information and trade secrets.

28

127.    As a result of Wood's breaches of his non-competition, non-solicitation, and confidentiality obligations, Derive has been injured irreparably.

128.    Derive is entitled to full compensatory and consequential damages, as well as full injunctive relief.

**COUNT VIII – BREACH OF CONTRACT**
**(AGAINST DEFENDANT HUNTER)**

129.    Derive re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

130.    Defendant Hunter signed valid agreements under Idaho law during his employment with BDT. Those agreements impose valid and enforceable obligations on Wood, including obligations during his employment and for a period of time thereafter, to protect BDT's hardware and software trade secrets, to respect the confidentiality of BDT's business information, not to prepare to compete, compete or solicit BDT customers, and not to solicit BDT employees.

131.    Defendant Hunter has materially breached these agreements by among other things: (1) preparing to compete with Derive during his employment and during the restricted period thereafter; and (2) competing with Derive by joining Defendant Wood in the production and sale of rival products.

132.    As a result of Hunter's breaches of his non-competition, non-solicitation, and confidentiality obligations, Derive has been injured irreparably.

133.    Derive is entitled to full compensatory and consequential damages, as well as full injunctive relief.

## COUNT IX – BREACH OF DUTY OF LOYALTY
### (AGAINST DEFENDANT WOOD)

134.   Derive re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

135.   As an employee of BDT and Derive, Defendant Wood had a duty of loyalty not to compete or interfere with BDT's and Derive's legitimate business interests.

136.   Defendant Wood breached his duty of loyalty by competing with BDT and Derive while still employed by BDT and, later, Derive.

137.   As a result of Wood's breaches of duty, Derive has been injured irreparably.

138.   Derive is entitled to full compensatory and consequential damages, as well as full injunctive relief.

## COUNT X – TORTIOUS INTERFERENCE WITH CONTRACT
### (AGAINST DEFENDANTS WOOD, TECHIT, AND EZ LYNK)

139.   Derive re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

140.   Derive has valid and enforceable agreements with its employees, including but not limited to Lance Hunter, that contain covenants that restrict the activities in which employees can engage during and after their employment.

141.   Defendants EZ LYNK, TechIT, and Wood were at all relevant times aware of these contractual obligations.

142.   Defendants Wood, TechIT, and EZ LYNK intentionally interfered with Derive's agreements with Lance Hunter by causing him to leave his employment with Derive, to violate his restrictive covenants by competing against Derive, and to take steps to conceal his violations.

143.     Defendants interfered with these agreements through improper means, namely subterfuge and violations of established standards of the trade.

144.     As a result of Defendants' tortious interference with Derive's contracts, Derive has been injured irreparably.

145.     Derive is entitled to full compensatory and consequential damages.

## COUNT XI – CONSPIRACY
## (AGAINST ALL DEFENDANTS)

146.     Derive re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

147.     Defendants combined and conspired with the purpose to infringe and misappropriate Derive's intellectual property.

148.     As described above, through this conspiracy, Defendants did infringe on Derive's copyright and trade dress, and misappropriated Derive's trade secrets.

149.     As a result of this conspiracy, Derive has sustained, and will continue to sustain, substantial injury, loss, and damages in an amount to be proven at trial.

## COUNT XII – UNFAIR COMPETITION
## (AGAINST ALL DEFENDANTS)

150.     Derive re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

151.     Defendants engaged in unlawful intentional business practices by infringing Derive's intellectual property. Defendant H&S additionally violated the H&S License Agreement in its use of Derive intellectual property.

152.     Defendants' unlawful business practices have led to a diminution in value of Derive's intellectual property and Derive has sustained, and will continue to sustain, substantial injury, loss, and damages in an amount to be proven at trial.

**COUNT XIII – UNJUST ENRICHMENT**
**(AGAINST ALL DEFENDANTS)**

153.     Derive re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

154.     Defendants have benefited from the improper, unfair, and unauthorized use of Derive's intellectual property.

155.     Defendants knew, or should have known, that their actions were improper and fully appreciated the benefits received as a result of its improper actions.

156.     Defendants would be unjustly enriched if they were permitted to retain the benefits obtained from such actions.

157.     Equity requires that Defendants be required to account for, and pay to Derive, an amount equal to the value of the benefits conferred upon them.

**REQUEST FOR RELIEF**

Derive respectfully requests that this Court enter judgment in Derive's favor, granting the following relief against the Defendants:

a)   issuing a preliminary and permanent injunction restraining all Defendants and anyone associated with EZ LYNK or H&S from acquiring, using or disclosing Derive's intellectual property, including its copyrights, trade dress, trade secrets and other confidential documents, data or information;

b)   issuing a preliminary and permanent injunction requiring all Defendants and anyone associated with EZ LYNK or H&S to account for and return to Derive all Derive intellectual property, including its copyrights, trade dress, trade secrets or

32

other confidential documents, data or information in their possession, custody or control, including any copies thereof;

c)   issuing a preliminary and permanent injunction requiring Defendants Wood and Hunter to abide fully by the confidentiality, non-compete and non-solicitation covenants they agreed to during their employment with BDT;

d)   issuing a preliminary and permanent injunction requiring Defendant H&S to abide fully by the H&S License Agreement;

e)   entering judgment in Derive's favor and awarding full compensatory and consequential damages to Derive and against all Defendants jointly and severally, in an amount to be determined at trial, factoring in all interest, costs and expenses;

f)   awarding Derive exemplary and punitive damages;

g)   awarding Derive its reasonable attorneys' fees and costs incurred in bringing and having to pursue this action; and

h)   providing Derive with such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

i)   Derive hereby demands a trial by jury as to all issues.

DATED this 18th day of October, 2016.

Respectfully submitted,

By: */s/ Phillip J. Russell*
      Brent O. Hatch
      Phillip J. Russell
      HATCH, JAMES & DODGE, P.C.

      Mark A. Klapow
      Michael J. Songer
      CROWELL & MORING LLP